In re Donald Roy BRAME, Karen Marie Hudson Brame, Debtors.

**WEST KENTUCKY PRODUCTION CREDIT ASSOCIATION, Plaintiff,**

v.

Donald Roy BRAME, Karen Marie Hudson Brame, Defendants.

**Bankruptcy No. 5–81–00238.
A.P. No. 5–81–0057.**

United States Bankruptcy Court, W. D. Kentucky.

Sept. 21, 1982.

J. D. Kemp, Hopkinsville, Ky., for plaintiff.

Rickie Johnson, Paducah, Ky., for defendant.

## MEMORANDUM AND ORDER

MERRITT S. DEITZ, Jr., Bankruptcy Judge.

In this farm bankruptcy, the creditor West Kentucky Production Credit Association contends for denial of the discharge sought by Donald and Karen Brame. The complaint recites every available statutory ground upon which the extraordinary remedy may be obtained—fraud, conversion, concealment or dissipation of assets, failure to keep adequate financial records, and false swearing under oath. The answer is a general denial.

The matter came to full trial, and at the close of plaintiff's case, defendants moved for dismissal of the complaint. Their motion was sustained. Plaintiff announced its intention to appeal. This memorandum is written to supplement our order from the bench and facilitate appellate review.

West Kentucky PCA is a secured creditor of the Brames by virtue of a 1980 transaction known by the parties as a "full proceeds loan." Principal amount of the loan was $595,000. The security taken by PCA was comprehensive. It consisted of a 219-acre Brame farm, one of three farms owned by the family; all machinery, equipment and tools; all livestock, including those later to be born or acquired; all commodities on hand and crops in the field.

The "full proceeds loan" was executed with a clear view toward liquidation. With the Brame farms having operated at a loss of $249,441 since 1976, and with PCA's preexisting mortgage position in clear jeopardy, the loan document called for: (1) sale of the 219-acre farm, (2) negotiations with Farmers Home Administration for refinancing of other existing farm mortgages, (3) direct payment to PCA of all proceeds from all sales of livestock and commodities, (4) strict supervision of cash flow by PCA, with any diversions of cash to result in immediate acceleration of the $595,000 note, and (5) no capital improvements in the farm operation. In these particulars the "full

proceeds loan" in the Brame case is not, we suspect, atypical of many such arrangements abroad in a disturbed farm economy.

In general terms, the full proceeds loan is a medium for restructuring troubled farm loans to minimize potential losses to both borrower and lender. At its best such an arrangement forces a cooperative effort toward resumption of debt service and the reduction of possible deficiency judgments. At its worst it invites abuse by a lender with plenary dominance over other creditors, or evasion by a borrower in a condition of perceived servitude, or both. The unusual tensions generated by such an arrangement may result in premature or uneconomical liquidation of farm assets with resulting major losses to both parties. Those unfortunate aspects are present here.

PCA's allegations of wrongdoing, any of which if uncontroverted could result in a denial of discharge, were pleaded with the required particularity. They are:

(1) Unexplained and unauthorized disposition of a thousand bushels of corn and the entire 1980 crop of soybeans from 300 acres.

(2) Transfer of a valuable wheat futures contract to Donald Brame's brother. The contract called for delivery of approximately 6,250 bushels at $5.00 per bushel. At the time of the transfer the price of wheat was approximately $3.20 per bushel; the difference of $1.80 per bushel represents the gross profit, or value, of the contract.

(3) Transfer of three farm trucks from Brame to his wife and then from her to her father, Roy Hudson.

(4) Concealment, sale or other wrongful disposition of an undetermined number of hogs.

These allegations and the proof concerning them will be discussed in the above order. Plaintiff's only witnesses were Daniel Helsley, a PCA assistant office manager and supervisor of the Brame loans, and Donald Brame, who was questioned as if on cross-examination.

(1) The missing corn, according to Helsley, was presumably used for livestock feed. No criminality is imputed to that use. Soy-

beans having a market value of over $15,-000 were sold for approximately $11,000, with the full sale proceeds going directly to George L. Atkins for farm rent owed by Brame to Atkins. The sale was handled at the elevator. No money passed through Brame's hands. Brame testified that some soybeans in storage with a Hopkinsville grain elevator were kept by the elevator for storage charges.

(2) Brame testified that the wheat futures contract had no value to him, since he had no wheat of milling quality and therefore was unable to deliver on it, and that he gave it to his brother, who had marketable wheat. The transfer was a pure gift, according to Brame, in partial reciprocity for similar past favors from his brother.

(3) Motor vehicle registration papers introduced into evidence by PCA showed that Brame transferred title to three farm trucks to his wife, who then immediately conveyed them to her father, Roy Hudson. Brame received $7,000 from his father-in-law. At that time, about two weeks before the Brames filed bankruptcy, the farming operations had been virtually dismantled. Foreclosure proceedings had been commenced and the Brames had contracted to buy a house in Hopkinsville. The $7,000 was used for the down payment. Both the vehicle transfers and the use of the sale proceeds for the home purchase were done with prior advice of counsel.

(4) It is the last point, the lack of accounting for the disposition of an unknown number of hogs, that is most troublesome to the Court. In both quantum and emphasis, proof on this point occupied a major part of the plaintiff's case.

Throughout a confident line of direct questioning, a quizzical cross-examination, and bemused suggestions of irrelevancy by the court, Mr. Helsley testified with mathematical precision that during the six months immediately prior to bankruptcy Brame wrongfully disposed of 317 pigs worth a total of $22,190. He figured as follows:

(a) Brame had 62 sows in inventory on December 31, 1980, each of which should have farrowed at least once between that date and July 16, 1982; (b) each farrowing should have produced a litter of six pigs; (c) each of the resulting total of 372 new pigs would have weighed at least seventy pounds by July, 1981, and would have been worth at least $1.00 per pound; (d) added to the 240 pigs known to have been on the Brame farm in December, 1980, there should have been a total of 612 pigs on hand when PCA began to round them up in July, 1981; (e) PCA recaptured only 275 pigs, with 20 pigs, more or less, escaping, and (f) therefore, Brame had wrongfully disposed of 317 pigs valued at $70 each at some time during the six-month period, with resulting damage to PCA in the amount of $22,190.

It is on this projection of porcine procreation, this forecast of farmyard fecundity, that plaintiff's proof most visibly breaks down. We take exception neither to the application of actuarial science to the art of husbandry, nor the credentials of this witness to address it. Such calculations are no doubt immensely valuable in projecting *future* herd growth and orderly farm planning, but as a method of proving *past facts,* particularly in support of a charge so grave as conversion, they are wholly illusory and therefore useless.

This method of presentation of proof is similar to proving damages before liability. It is, with no pun intended, an exercise in piggyback reasoning; proof of damages, so the thinking goes, proves liability. A certain number of pigs should have been born, should have weighed so much, worth so much per pound, and the fact of their absence proves conversion by their owner. The concept does not yield to logical analysis, in that it proceeds from the conclusion, not the facts leading to it.[1]

■ On cross-examination, Brame was questioned not at all concerning the al-

legedly missing pigs. We are left to speculate as to their number, weight, value and whereabouts, and as we have earlier observed, conjecture "is an inadequate foundation upon which to rest the heavy consequences of nondischargeability." [2]

■ Further on that point, the record reveals that during the period in question PCA knew that Brame was selling hogs and corn—"for living (modestly) and operating," according to the notations on an October, 1980, field report by Mr. Heltsley— which would negate any surreptitious intent on Brame's part. He has admitted the sales.

With respect to the transfers of soybeans, wheat futures and farm trucks, Brame's testimony was more than sufficient to negate any inference of wrongdoing in the disposition of those items or in the concealment of their disposition.

The soybeans were given to a landlord for rent. His failure to report that in his petition is answered by his testimony that he did not know the details of the transfer until after his petition was filed, and had in fact assumed earlier that PCA had taken the soybeans.

The intrafamily transfers of wheat futures also have been adequately explained. The gift of wheat contracts may have been imprudent and arguably in violation of the PCA security agreement, but we find that it was done out of Brame's inability to deliver on them and for the predominant purpose of aiding a family member, not defrauding a creditor. Brame said he felt "a moral obligation" toward the brother who had helped him, a motive rarely advanced before this court and one to be encouraged.

Regarding Brame's sale of three farm trucks to his father-in-law, it is true that the transfer of a mortgaged vehicle without

---

1. Hypothetical pigs can be proven celibate, if need be, as well as proliferous. In a contemporaneous case before this court, the creditor PCA claims lack of adequate protection in Chapter 11 because the debtor cannot prove that his pigs will reproduce as proposed by the

Chapter 11 plan. The pigs, so far as we know, are unaware of the plan.

2. *Compton v. Thurmond,* BK 76–0148–P (May 19, 1979).

the consent or satisfaction of the secured party is at the very least a technical conversion. But here PCA claims no security in the vehicles, and any allegation of wrongful intent is fully answered by the fact that the transfer was made with the advice of counsel.

Even if the fact of legal advice was unavailable as a defense, we would not grant the relief sought based upon this aspect of the case. The administration of equity presupposes a sensitive equilibrium between legal wrong and resulting remedy. To require, through a denial of discharge, the repayment of $997,340 in debts because of the sale of three farm trucks for $7,000, would be to work an inequity of gross disproportion.

Brame's failure of recordkeeping and accounting has been both proven and satisfactorily explained.[2a] With creditors having undertaken repossession and foreclosure after the 1980 harvest, there was no productive farm operation conducted in 1981 of which to keep a record. There were dispositions of property, evidenced by fragmentary receipts and cancelled checks and admitted by Brame. But a farmer "is simply not engaged in an occupation in which bookkeeping is the normal practice." *Matter of Worley,* 47 F.Supp. 212 (D.C.Neb. 1942). Even in cases where virtually no books are kept and a denial of discharge is sought on that ground, we are clearly admonished by the Sixth Circuit Court of Appeals that "the right to a discharge in bankruptcy should be liberally construed." *In re Newman,* 126 F.2d 336 (6th Cir. 1942).[3]

We embrace, and with this memorandum hopefully reflect, the prevailing view in this Circuit:

The grant of the discharge, therefore, is dependent upon the finding of the court that the failure to keep books was justified under all the circumstances of the case. In the determination of this question, it is evident that Congress intended that the District Court should exercise a wide discretion. If the facts do not disclose a positive duty to keep the books and records, or, disclosing such a duty, there appears to be sufficient ground to warrant a finding of extenuating circumstances, an order of discharge should not be disturbed on appeal. Conversely, a denial of discharge should not be disturbed unless arbitrary or clearly unjust. Within this range of sound judicial discretion, the District Court must interpret the facts and apply the rules of reasonable conduct in the light of business as well as judicial experience, to the end that the purposes of the Bankruptcy Act may be subserved.[4]

Concerning the allegation of false swearing under oath, we find that Brame has made sufficient disclosure of relevant facts during the course of this adversary proceeding to cure any inadequacy of disclosure at the first meeting of creditors. Under the new bankruptcy law those meetings are not conducted before the court. But we can understand how a debtor testifying in an atmosphere charged with hostility would choose to defensively minimize his disclosure. There were additional discovery mechanisms available to plaintiff under Bankruptcy Rule 205 both before and after that meeting which were not used. Discovery may have revealed the weakness of plaintiff's case, but regardless of that speculation, as we have said, the testimony at trial supplied all necessary information for a judicial resolution of this dispute.

---

**2a.** It is the deficiencies of *1981* recordkeeping of which plaintiff complains. The 1980 records kept by defendants, showing farm revenues of $144,458 and payments to PCA of $102,752, are comprehensive and undisputed.

**3.** Liberal construction in favor of the bankruptcy petitioner may be regarded as established doctrine, protected by stringent application of the "clearly erroneous" rule on appeal. See *Minnick v. Lafayette Loan & Trust Co.,* 392

F.2d 973 (7th Cir. 1968), cert. denied 393 U.S. 875, 89 S.Ct. 170, 21 L.Ed.2d 146.

**4.** *Hilliard v. Hollins,* 290 F.2d 263 (6th Cir. 1961), cites with approval this analysis from *Texas Nat. Bank of Beaumont v. Edson,* 100 F.2d 789, 791 (5th Cir. 1939), in applying the "clearly erroneous" rule to the review of Bankruptcy Court findings of fact.

Throughout his testimony, Brame appeared altogether straightforward and ingenuous. On cross-examination he readily volunteered more information than was requested. The scenario that emerges from the whole record is that of a random, haphazard and eleventh-hour disposition of the remains of a dismembered farming operation, without apparent orderly thought of maximizing the benefits of liquidation either to the farmer or to the creditor PCA.

That the liquidation was precipitated by the creditor bringing this action neither attributes fault to that creditor nor excuses Brame's negligent actions. That his conduct was in clear violation of the full proceeds loan agreement with PCA is abundantly evident. We simply hold that that conduct, and his subsequent behavior after seeking the protection of this court, are not actionable under Section 727 of the Bankruptcy Code. And the court will admit to some sympathy for a man who, with his newborn infant hospitalized in another state [5] and his estate being Balkanized by creditors, retrenches to the relative security of his immediate farming family, apportioning his remaining assets among them.

Denial of a discharge in bankruptcy is a creditor's remedy of such sharply punitive permanence that it is reserved for the truly pernicious debtor. Only where there is a preconceived scheme to thwart the rights of creditors and the processes of this court, or such a cavalier disregard of duty as to constitute the legal equivalent of those motives, is the discharge withheld. The measure of proof required to establish such a case is accordingly a most exacting one, of which this plaintiff's presentation has fallen short.

None of the foregoing discourse should be taken to mean that this bankruptcy estate is without questionable irregularities. More than a casual observer at the trial of this matter was the bankruptcy trustee, whose attendance was for the stated purpose of obtaining information concerning possible preferential transfers subject to trustee attack.

This record obviously supplies the trustee with sufficient cause to inquire into the possible recapture of property from the landlord Atkins, the father-in-law Hudson, the Hopkinsville grain elevator, and the PCA.[6] But none of those matters are before us for resolution, and our holding of no actionable irregularity applies only to the claim by PCA against Brame for alleged Section 727 violations.

We write to unusual length not only because of the certainty of appeal, but because this case is the harbinger of what we perceive to be a new pattern of bankruptcy litigation as PCAs throughout Kentucky attempt to recoup their losses in a depressed agricultural economy.

Since this action was filed, nine others promptly followed, with the PCA-plaintiffs seeking relief ranging from across-the-board denial of discharge to the right of foreclosure or recapture of secured properties. While we do not yet ascribe to this phenomenon the nature of a coordinated campaign, the gross effect of this cumulative litigation, if successful, would be to shift the losses realized in a depressed economy from agricultural financing associations to individual farmers already claiming bankruptcy relief.[7]

---

5. Our sympathy on this point is tempered by a healthy skepticism of the motives for its gratuitous intrusion into the record.

6. By its very nature, the "full proceeds loan" invites inquiry as to its preferential character. The document here in question, for example, not only anticipates but requires liquidation. Whether a preference existed would of course depend upon the timing of the execution of the loan and the recapture of property accomplished pursuant to its terms. But in any event, the full-proceeds arrangement lends credence to "suggestions that some creditors 'keep alive' a debtor beyond the period of vulnerability for the very purpose of protecting a transfer otherwise avoidable as a preference." McCoid, Bankruptcy, Preferences, and Efficiency; An Expression of Doubt, 67 Va.L.Rev. 249, 264 (1981).

7. Twenty-one farm bankruptcies are now pending, involving a total of almost 8,000 acres of Kentucky farmland valued at $14.6 million. PCAs have mortgages on those farms totaling just over $5.5 million.

Our decision today is reached through conventional principles of statutory construction and caselaw analysis, and it applies only to the case at hand. But the broader teachings of history and economics support our result and suggest the applicability of our thinking to similar cases.

If a page of history is indeed worth a volume of logic, as Justice Holmes said, then we should note the historical deference paid to the farmer. As a food producer vital to society, the farmer occupies a favored station in the law. Much of established bankruptcy doctrine as expressed in the statutes and cases derives from what was originally known as the Farmer's Relief Act, and special protections are extended to him under the new Bankruptcy Code.[8]

Economic analysis of loss-shifting suggests that losses should be borne by the "superior risk-bearer"—a designation given, in the esoteric parlance of economics, to the party to a transaction who is in the best position to appraise the nature and extent of risks contractually assumed and the possibility of losses resulting from their occurrence.[9] By that definition, a financing cooperative whose very existence is justified on the principle of loss-sharing must be deemed "superior" to the individual farmer.

These considerations are admittedly collateral to our basic approach in resolving the dispute at hand. But any judicial opinion, if it is to have more than a single application, should give an honest insight into the judicial attitudes which went into its writing. Certain knowledge of the law and predictability of results require no less. This opinion is intentionally constructed to furnish one clear window into chambers.

With the substance of the claim resolved, an ancillary matter remains. The defendants as prevailing parties are entitled to consideration of their motion for attorneys

fees. That matter will be dealt with by separate order.

This memorandum represents our findings of fact and conclusions of law to accompany the order dismissing the complaint, which is signed today as a final order. Because of the complexities of the file and the difficulties of geography, any request for an extension of time within which to perfect an appeal will be granted. In the interest of finality the parties may wish to consider a direct appeal by agreement to the Sixth Circuit Court of Appeals.

---

8. For example, a farmer's reorganization efforts under Chapter 11 may not be converted to a Chapter 7 liquidation without the farmer's request.

9. For a discussion of the difficulties of apportioning economic losses through the judicial process, see Posner, *Economic Analysis of the*

*Law,* Chapter 19: "The Market, The Adversary System and the Legislative process as Methods of Resource Allocation" (Little, Brown & Co. 1977). See also Kronman and Posner, *The Economics of Contract Law* at p. 133 (Little, Brown & Co. 1979).