In re William E. VANCE, Sue C. Vance, Debtor.

NOLIN PRODUCTION CREDIT ASSOCIATION, Plaintiff,

v.

William E. VANCE and Sue C. Vance, Defendants.

Bankruptcy No. 1–82–00102.
Adv. No. 1–82–0056.

United States Bankruptcy Court,
W.D. Kentucky.

Oct. 5, 1984.

James C. Ladd, Munfordville, Ky., for debtor.

Dwight Preston, Elizabethtown, Ky., for plaintiff.

Henry Dickinson, Glasgow, Ky., Trustee.

## MEMORANDUM OPINION

MERRITT S. DEITZ, Jr., Bankruptcy Judge.

Counting cattle may be a pacifying exercise for small children on long trips, but it makes for poor reading in judicial opinions. Nonetheless, counting cattle—how many there were, who they belonged to, and where they went—is what this opinion is all about.

The case takes the form of a creditor's complaint invoking the most severe non-criminal remedy available against debtors, the absolute denial of a bankruptcy discharge. The reason given is the debtors' failure to adequately account for their assets. There are additional grounds recited in the complaint, but we will defer consideration of them until a brief summary of the facts which predominated the pleadings, the trial and the legal argument of counsel.

By virtue of security agreements dating back to 1976 and 1977 which contained after-acquired property clauses, the plaintiff Nolin Production Credit Association claimed a secured interest in all livestock owned by the defendants William and Sue Vance when they filed their bankruptcy petition on March 8, 1982. The Vances claimed ownership of 43 head of cattle on that date. The PCA asserts that they had owned 202 cattle four months earlier. It is the unexplained difference of 159 cattle which forms the basis of the plaintiff's allegation that, in the words of the statute, "the debtor has failed to explain satisfactorily ... any loss of assets or deficiency of assets to meet the debtor's liabilities".[1]

At this point in our writing, in order to avoid the mathematical confusion which pervaded the trial and would confound any reader of the trial transcript and related depositions, we will trace a chronology of the parties' dealing from a prepetition date, dealing only with facts which are essentially undisputed.

In May, 1981, according to a field report prepared by a PCA officer, there were 83 head of cattle on the Vance farm. Between May 13 and December 7, 1981, Vance sold 26 head and accounted to PCA for the proceeds pursuant to an agreement between the parties.[2]

So presumably there should have been only 57 head of cattle on the farm on December 7, when a PCA officer returned for another visual inspection of the herd.

---

1. 11 U.S.C. § 727(a)(5).

2. The agreement was a "full proceeds loan agreement" of the sort analyzed by this court in *In Re Brame.* 23 B.R. 196 (Bkrtcy.1982).

Instead there were 202 cattle. The count was taken by the PCA officer during a pickup truck ride around a farm of over 100 acres. How many of the 202 head were full-grown cows and how many were calves was a subject of disputed testimony and remains an open question. The exact figure of 202 head seems to be firmly established by the record, although the possibility of marginal error is admitted by the parties.

Moving now from undisputed to disputed facts, we note that the sudden increase in the population of the herd is susceptible to two possible explanations:

1. The PCA's "Current Field Report" of December 7, 1981, bore the notation by loan officer Kenneth Adams that "Member (Vance) has bought 145 hd. of mixed cattle that are not ours for security. We are 3 hd short on the C.F.R. but all of the cattle were running together in one large field and this was as close as I could get".

2. Mike Hatcher, a cattle trader and friend of Vance, put 90 to 110 cows, many ready to calve, on the farm in the fall of 1981 under a profit-sharing arrangement with Vance that is neither clear nor relevant.

Depending upon the explanation one accepts, it appears that either (a) the herd had increased by 90–145 head of cattle owned by Vance but in which PCA had no security interest,[3] or (b) the same cattle, however many there were, belonged not to Vance but to Hatcher.

We are inclined to accept the latter assertion. The PCA agent's notation on the field report that "member *has bought* 145 hd. of mixed cattle" appears to have been pure assumption. The fact of ownership is expressly denied by Vance. Hatcher's undisputed testimony was that he put 90–110 cows, many ready to calve, on the farm in October and November, 1981. The grow-

ing calves could have increased the apparent head count to 145 by the time the field report was made in December, although the PCA agent's report described 145 head of "mixed cows (now calving)".

The agent's observation could lead to an assumption that there were 145 additional grown animals *plus* an unknown number of their offspring. But such an assumption is not supported by the record. The parties agree that there were 202 head on the farm at the time of the count; that there had been 83 head seven months earlier, and that 26 of those 83 cattle had been sold and accounted for before the December field report. Arithmetic demands that the pre-December addition to the herd was 145 head, whether cows, calves, or both.

The proof taken as a whole, including PCA documents as well as Vance's testimony, leads to the fixed belief that there was an increase in the herd of 145 head from May to December, 1981, and that those cattle belonged to Hatcher, not to Vance.

Any lingering confusion as to the exact number of additional cows is irrelevant if it is true, as we believe, that the added cows belonged to Hatcher. We find as a fact, based on the best available evidence and testimony, that there were 202 head of cattle on the farm in December, 1981, of which 145 were the property of Mike Hatcher.

Hatcher removed his cattle from the farm between December, 1981 and March 8, 1982, the date of the bankruptcy petition. What disposition he made of them and what benefit Vance may have derived, if any, was not the subject of the complaint or any testimony at the trial.

Of the remaining cattle, nine were sold by Vance and an accounting made to the PCA; four were killed by lightning, and one died of grass tetanus. Vance was clear on all of these points and his testimo-

---

**3.** The defendants in their briefs make a major point that the PCA had no security interest in the increase in the herd. PCA has asserted no such interest. The defendants' argument would have meaning if this were a conversion case under § 523(a)(6), but it is irrelevant in re-

sponse to a § 727(a)(5) challenge. Under that section, even if the cattle were the exclusive and unencumbered property of Vance, his failure to properly account for them could justify a denial of a discharge.

ny was uncontroverted. A simple subtraction table thus confirms the accuracy of Vance's report of 43 head owned on the date of bankruptcy:

| | |
|---|---:|
| Herd as of Dec. 7, 1981 | 202 |
| Hatcher's cattle | −145 |
| Sold and accounted for | − 9 |
| Killed by lightning | − 4 |
| Died of grass tetanus | − 1 |
| Herd as of Mar. 8, 1982 | 43 |

In summary, we find that Vance has satisfactorily explained the diminution of his herd during the three months preceding bankruptcy, and therefore that the allegations of the complaint to the contrary are without basis.

Not since *In re Brame*[4] have we been asked to retrace the movement of livestock, years after the fact, with the debtor under the ultimate threat of a denial of discharge. The problems of proof in such cases are likely to be created at the outset and unlikely to be improved through the formality of a trial. For example, if a cattleman and his banker cannot be absolutely certain how many cattle they saw during a "windshield count" of a running herd on a large farm, a judge can do no better three years later in listening to testimony at a trial or reading a transcript in the silence of his chambers.

Our determination in this particular case has been simplified somewhat by the fact that certain benchmark figures were established (202 cattle in December, 1981, and 145 cattle belonging to Hatcher). Further, on the known sales and death of a number of cattle, we can trust Vance's recollections, particularly since they are not disputed. The herdsman knows his herd, and such events as getting a check or disposing of a carcass tend to stand out in the mind.

However, upon the more elusive subject of how many cattle may have been born and survived within the herd during the

months before bankruptcy, we are left only to speculate. We are no more able now to make lasting assumptions based upon actuarial possibilities than we were at the time of *Brame*. And as we observed in *Brame*, conjecture "is an inadequate foundation upon which to rest the heavy consequences of nondischargeability".[5]

Our holding today is almost exclusively a factual one. No sophisticated or intricate questions of law are presented by the case. The language of the controlling statute, 11 U.S.C. § 727(a)(5), is clear beyond further definition, and the cases under it simply measure their own facts against the statutory demand.

We have been generally guided by the view of the Sixth Circuit Court of Appeals that "the right to a discharge in bankruptcy should be liberally construed",[6] in approaching the question of whether there has been a "satisfactory explanation" of the disposition of assets. Exactly what constitutes a satisfactory explanation "has not been expressly defined", but in the view of a ranking commentator, "it probably means that the debtor must explain his losses or deficiencies in such manner as to convince the court of good faith."[7]

In point of fact, according to the arithmetic exercise earlier in this opinion, there has been *no* unexplained loss of assets for which Vance should be held further to account. The record does show a certain laxity in recording births and deaths in the herd, which may explain why the debtor finally had to resort to this court, but it does not establish bad faith, concealment, or a disregard of the rights of creditors. Farmers are not "engaged in an occupation in which bookkeeping is the normal practice",[8] and we cannot hold them to a higher standard of exactitude than the realities of the case permit. We are, after all, charged to "interpret the facts and apply the rules

---

4. Supra note 2.

5. *In Re Brame,* 23 B.R. at 198.

6. *In Re Newman,* 126 F.2d 336 (1942).

7. 4 Collier on Bankruptcy ¶ 727.08 (15th Ed. 1982).

8. *Matter of Worley,* 47 F.Supp. 212 (D.C.Neb. 1942).

of reasonable conduct in the light of business as well as judicial experience, to the end that the purposes of the Bankruptcy Act may be served."[9]

The complaint in this case also alleged a violation of 11 U.S.C. § 727(a)(2) in the fraudulent transfer or removal of certain farm equipment and machinery. That line of contention was not pursued at the trial and the Court ruled that, the burden of proof not having been met, those allegations would be struck from the complaint. Hence this opinion has focused exclusively upon the real point in controversy, the disposition of cattle.

By separate and final Order we will dismiss the complaint herein with prejudice.

**9.** This language from *Texas Nat. Bank of Beaumont v. Edson* 100 F.2d 789, 791 (5th Cir.1939), is quoted with approval by the Sixth Circuit in applying the "clearly erroneous" rule to the review of bankruptcy court findings of fact; *Hilliard v. Hollins,* 290 F.2d 263 (1961).