In re Veachel CLINE, Donna Cline, Mitchell Cline, Rose Mary Cline, Cline Brothers Dairy, Cline Brothers Dairy, Inc., Richard Cline, Mary Cline, Debtors.

CITIZENS BANK AND
TRUST COMPANY

v.

Veachel CLINE, et al.

Bankruptcy Nos. 18300383 to 18300387. Adv. Nos. 1830091 to 1830095.

United States Bankruptcy Court,
W.D. Kentucky.

Aug. 21, 1985.

Walter Winn Davis, Glasgow, Ky., for plaintiffs.

Jon W. Goodman, Munfordville, Ky., for defendants.

1. Random House College Dictionary (1982 ed, unabridged).

Henry Dickinson, Glasgow, Ky., Trustee.

## MEMORANDUM OPINION

MERRITT S. DEITZ, Jr., Bankruptcy Judge.

In the case at hand, we lay aside stare decisis, statutory construction and other judicial tools in favor of the mystical process of arithmancy, "divination by the use of numbers."[1] For we are confronted once again with the bankruptcy judge's empirically impossible task, that of deciding how many cattle were in a bankrupt farmer's field years ago, and where they went.

A complaint by Citizens State Bank and Trust Company of Glasgow states no fewer than six separate grounds for denying these debtors a discharge on all or part of the $300,000 they owe Citizens. At trial, however, the bank pressed only its 11 U.S.C. § 523(a)(6) claim. We therefore rule at the outset that Citizens has failed to meet its burden of proof in its allegations of nondischargeability under sections 727(a)(2); 727(a)(4); 523(a)(2) and 523(a)(4) of the Bankruptcy Code. Our opinion will focus on the only real point in controversy, the alleged conversion of cattle by the debtors. We will briefly outline the facts.

For the past twenty years the debtors and their business entities have had a close working relationship with Citizens. From the late 1960's until 1980 the debtors were engaged in a general, diversified farming operation. In 1980 the debtors decided to specialize in dairy and tobacco production. They discussed their plans with Tommy Jackson, a loan officer at Citizens, on the basis of which Citizens agreed to loan the debtors the funds necessary to build a dairy herd. Citizens took and perfected a security interest in the debtors' cattle, under the terms of which the debtors were to sell only bulls, steers and culls. The debtors had unlimited discretion in determining which cows were culls.[2] In the three years

2. A cull is a dry or nonproducing dairy cow. Considering the economic reality that any dairy cow is "unprofitable" if it is kept by its owner when it could be sold or traded for more profit-

prior to the debtors' bankruptcies, Citizens neither formally released any cows sold or traded by the debtors nor objected to any of these transactions even though they were generally aware of the debtors' cattle dealings.

In January of 1983 the debtors gave Citizens a financing statement which included an inventory of their dairy herd. The inventory represented an actual head count of the debtors' dairy herd and showed a total herd of 547 animals. Included in these figures were 45 head of cattle which were leased by the debtors from their father. This inclusion was clearly accidental and did not result from any improper motives on the part of the debtors.

Shortly thereafter the debtors renewed their note with Citizens and borrowed an additional $105,000 from the bank to pay the interest on the renewed note and to make a land payment to another creditor. The bank did not request a detailed inventory of the debtors' assets at this time.

In July of 1983 the debtors had a small note with Citizens come due. At this time Tommy Jackson visited the debtors' farm to look over the cattle. Jackson made a quick "windshield count" of the dairy herd and was satisfied as to the number of animals on the farm. He requested a statement indicating the number of cattle the debtors had on hand, but indicated that a precise head count was unnecessary. Within a week of Jackson's visit, the debtors represented to Citizens that there were approximately 477 head of cattle in their possession.

The debtors filed for bankruptcy on August 30, 1983, reciting in their petition that they owned 264 head of cattle. The balance due on the debtors' note held by Citizens is approximately $300,000.

\* \* \* \* \* \*

The principal controversy in this proceeding concerns the diminution of the debtors' dairy herd during the seven months immediately preceding their bankruptcy. Our inquiry today is exclusively factual. As in two previous cases, In re Brame[3] and In re Vance,[4] we are called upon to track the movement of livestock years after the fact. As in those earlier exercises, we are faced with the difficult problems of proof which were caused in the most part by the casual manner in which the parties conducted their business affairs.

■■■ Citizens initially contends that the debtors willfully and maliciously converted its property by merely selling the cattle in which it had a security interest without first obtaining their consent. The debtors maintain that the bank had full knowledge of their cattle dealings and consented to this activity. After reviewing all the evidence, including the testimony of the parties presented at the evidentiary hearing, we are of the opinion that the debtors had a good faith belief that Citizens had either expressly or implicitly consented to their cattle trading. It is a settled principle of bankruptcy law that a debtor who in good faith converts the property of another by disposing of collateral under the mistaken belief that he has a right to do so "is to be relieved in bankruptcy and is not a malicious wrongdoer".[5] Therefore the mere sale by the debtors of cattle which secured their debt to Citizens does not constitute a violation of § 523(a)(6) under the facts of this case.

■■ Citizens, however, also alleges a far more serious ground for denial of a discharge on a portion—$66,125—of their total debt.[6] At trial, Citizens attempted to

---

able assets, then it is clear that the debtors could have reasonably construed the terms of the security agreement as allowing them to actively trade cattle.

**3.** 23 B.R. 196 (Bkrtcy.W.D.Ky.1982).

**4.** 43 B.R. 99 (Bkrtcy.W.D.Ky.1984).

**5.** *United States Bank of Southgate v. Nelson,* 35 B.R. 766, 776 (N.D.Ill.1983); *See also Davis v. Aetna Acceptance Co.,* 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1934); *In re Roberts,* 8 B.R. 291 (W.D.Mo.1981).

**6.** In an action under § 523(a)(6) to have a debt found nondischargeable on the grounds that the debtor converted collateral, the amount of the

show through the testimony of James Earl Cline [7] and inventory reconciliations prepared by Tommy Jackson that the debtors sold or otherwise disposed of 94 to 118 head of cattle [8] without accounting for the proceeds, as they had done after all earlier cattle sales. The basic contention underlying this line of reasoning is that shortly before the debtors filed for bankruptcy they secretly disposed of nearly one-third of their dairy herd and retained the benefits of this illegal transaction for themselves.

This court readily agrees with Citizens that a "secret sale" such as the one alleged in this case would clearly constitute a non-dischargeable conversion for purposes of § 523(a)(6). However, we do not believe that Citizens has proven that the debtors ever engaged in such a transaction.

■ Both at trial and in their briefs Citizens places great reliance upon the testimony of James Earl Cline. Cline testified that in July of 1983, shortly after Tommy Jackson's visit to the debtors' farm, approximately 100 animals were removed from the farm. In our opinion Citizens' reliance on this testimony is misplaced. It is rare for a court to totally disregard the testimony of any witness, but after carefully observing the demeanor of this witness at trial, and even making some allowances for what appear to be serious mental deficiencies, we are of the opinion that Cline's testimony is not entitled to the slightest weight. What little credibility Cline may have developed by his direct testimony was totally de-stroyed by the effective cross-examination conducted by the debtors' counsel; Cline's animosity to his blood relatives was made clear to the court and cast significant doubt on his credibility.

■ The evidence presented by Tommy Jackson is not so easily dismissed. The reconciliations he prepared of the debtors' dairy herd inventory showed that approximately 100 head of cattle "disappeared" from the debtor's farm between January and August of 1983. Although an exact reconciliation is impossible due to the state of the debtor's records,[9] Jacksons' figures if accepted at face value could represent a pattern of conversion which would prevent the debt from being discharged under § 523(a)(6). However, a close examination of the inventory reconciliation shows that it is based not only on the actual business records of the debtor, but also on estimates of the herd's birth and death rate. The birth and death rate are loosely based on statements by the debtors at a deposition. The use of *birth and death projections* as a method of proving conversion, whether based on the "application of actuarial science to the art of husbandry" [10] or on the best recollection of a farmer years after the fact, has been expressly rejected by this court in the cases of *In re Brame* and *In re Vance.* As we stated in the latter case:

> [U]pon the more elusive subject of how many cattle may have been born and survived within the herd during the months before bankruptcy, we are left only a rough estimate of the herd size at that date, we will give it little weight and instead concentrate in this opinion on the January/August reconciliation, which uses an actual head count of the debtors' herd as its starting point.

debt to be held nondischargeable is the reasonable market value of the collateral converted at the time of the conversion. *In re Ricker,* 26 B.R. 862 (Bkrtcy.E.D.Tenn.1983); *In re Tanner,* 17 B.R. 201 (Bkrtcy.W.D.Ky.1982). In this case the fair market value of the cattle at the time of their alleged conversion is $66,125.

7. James Earl Cline is a cousin of the debtors and worked on their farm at the time in question.

8. Tommy Jackson prepared two separate inventory reconciliations, one going from January of 1983 to August and the other going from July to August. Since we have already found that the basis of Jackson's July/August reconciliation is

9. While the debtors' records are somewhat confusing and show a lack of organization, that alone is not enough to deny the debtors a discharge. See *In re Vance,* 43 B.R. at 99; *In re Brame,* 23 B.R. at 196; *Matter of Worley,* 47 F.Supp. 212 (D.Neb.1942) (a farmer "is simply not engaged in an occupation in which bookkeeping is the normal practice").

10. *In re Brame,* 23 B.R. at 198.

only to speculate. We are no more able now to make lasting assumptions based on actuarial possibilities than we were at the time of *Brame.* And as we observed in *Brame,* conjecture "is an inadequate foundation upon which to rest the heavy consequences of nondischargeability".[11]

 In the present action, if we remove the estimates of herd births and deaths from Jackson's figures we get the following reconciled herd inventory:

| | |
|---|---|
| Herd as of January 25, 1983 | 547 |
| Cows rented from debtor's father | −45 |
| Cattle purchased by debtors in 1983 (Citizens' figures) | +90 |
| Cattle slaughtered/or sold by debtors (Citizens' figures) | −308 |
| Cattle stolen (Citizens' figures) | −42 |
| Total number of cattle which should have been present at time of debtors' bankruptcy. | 242 |

This reconciliation using Citizens' figures shows that there has been no unexplained disappearance of collateral for which the debtors should be denied a discharge. Indeed the figures reflect a small increase in herd size in all likelihood reflecting the true number of births and deaths which occurred in the debtors' dairy herd in the seven months prior to the debtors bankruptcy. We therefore hold that Citizens' has failed to prove that the debtors willfully and maliciously converted its collateral so as to render any portion of their obligation nondischargeable under § 523(a)(6). An order to that effect will be entered today.

**11.** *In re Vance,* 43 B.R. at 102.