**In re Jimmie Earl DORMAN, Marie Bernadette Dorman, Debtors,**

**UNITED STATES of America, Plaintiff,**

**v.**

**Jimmie Earl DORMAN and Marie Bernadette Dorman, Defendants.**

Bankruptcy No. 82–40782.
Adv. No. 83–0009.

United States Bankruptcy Court,
D. Kansas.

Jan. 21, 1987.

Wallace M. Buck, Jr., Probasco & Buck, Topeka, Kan. for debtors.

Karen M. Humphreys, Redmond, Redmond, O'Brien & Nazar, Wichita, Kan., for FmHA.

Tanya Wilson, Asst. U.S. Atty., Topeka, Kan.

Beau Williams, Oklahoma City, Okl., trustee.

## MEMORANDUM OF DECISION

JAMES A. PUSATERI, Bankruptcy Judge.

This adversary proceeding is before the Court for final decision on the amended complaint of the United States of America through its agency the Farmers Home Administration of the Department of Agriculture, (hereinafter "FmHA") for determination of dischargeability under 11 U.S.C. § 523 and denial of discharge under 11 U.S.C. § 727. FmHA is represented by Karen M. Humphreys, and Jimmie Earl Dorman and Marie Bernadette Dorman (hereinafter the "Debtor") are represented by Wallace M. Buck, Jr.

FmHA contends that the Debtor willfully and maliciously converted its property by selling cattle in which it had a security interest without its consent and by failing thereafter to pay over the proceeds. FmHA asserts that Debtor:

1. Willfully and maliciously converted secured cattle under § 523(a)(6):

2. failed to explain satisfactorily loss of assets under § 727(a)(5);

3. should be denied discharge for the full amount of the debt owed, or $307,-710.57.

## FINDINGS OF FACT

1. Debtor began a farm and ranch operation in Campo, Colorado in 1975 having moved to that location from Concordia, Kansas.

2. Debtor had previously been involved in a number of businesses, all of which were related to ranching and farming. Specifically, Debtor and his sons had engaged in a dairy operation near Concordia under the corporate name of Dorman Farms, Inc. (hereinafter "the Corporation").

3. In 1976, Debtor sold all stock interest in the Corporation and his sons assumed all responsibilities for the day-to-day management of the Corporation. However, Debtor continues to serve as president of the Corporation. Debtor has given conflicting testimony regarding whether he has authority to sign checks on behalf of the Corporation.

4. Debtor's Colorado ranching and farming operation consisted of 2,700 acres, which included certain Colorado State Grazing Lands and/or U.S. Forestry property.

5. Debtor estimates that, at any one time, he had a maximum of 700 head in the Colorado ranching operation. Less than fifty percent of that number consisted of heifers, which Debtor fed and sold to breeders, who continued to grow them until they were ready to calve and produce milk to dairymen. The remainder of Debtor's herd consisted of beef cattle.

6. Corporate cattle were shipped to Campo on a seasonal basis to "winter" upon Debtor's pasture lands. Debtor testified that Corporate cattle and Debtor's cattle were grazed in different pastures to avoid commingling. State or federal grazing regulations require that the lessee's livestock brand appear on all cattle grazing on such public lands. In order to comply with this regulation, Debtor testified that he branded Corporate cattle with the Debtor's brand. By maintaining separate grazing and separate feed bills Debtor testified that he can identify which cattle belong to the Corporation, despite his admitted practice of misbranding.

7. On August 15, 1979 Debtor received a loan in the original principal amount of $177,500 from FmHA (hereinafter the "First Loan"). Debtor dealt with Chris Wysock, County Supervisor for the FmHA Springfield, Colorado office in connection with this loan. Initially, the loan proceeds of the First Loan were intended to be used to purchase additional cattle. Actually, with Wysock's permission, Debtor sold 411 head of cattle he already owned and acquired a new set of cattle with the sale proceeds. The loan proceeds, when received, were then used to pay off certain other debts owed by Debtor, including a debt owed to First National Bank of Springfield (hereinafter "First National").

8. On August 16, 1979, First National Bank released its lien against certain cattle owned by Debtor.

9. The first loan was secured by a perfected security interest in the Debtor's cattle, and such security interest was evidenced by a Security Agreement dated August 15, 1979 (hereinafter the "First Security Agreement"). The First Security Agreement specifically identified 253 head of cattle by number, type, color and age and also extended to "all livestock ... now owned or hereafter acquired by Debtor ..." and any and all offspring.

10. On February 22, 1980, Debtor received a second loan from FmHA in the original principal amount of $187,500 (hereinafter the "Second Loan"). The purpose of the Second Loan was to allow Debtor to make certain fall payments and to purchase more livestock. The Second Loan was secured by a perfected security interest in Debtor's cattle and was evidenced by a security agreement dated February 22, 1980 (hereinafter the "Second Security Agreement"). The Second Security Agreement specifically identified 775 head of cattle, which included those cattle already pledged pursuant to the First Loan. Debtor estimates that only 750 head of cattle were actually pledged, due to a duplication of calf numbers reflected on the Second Security Agreement. Again, the security interest extended to "all livestock ... now owned or hereafter acquired by Debtor ..." and all offspring.

11. Debtor testified that it was his understanding that any time he sold cattle and purchased more, the additional cattle would be included as FmHA's collateral pursuant to the "after-acquired" property clause contained in both the First and Second Security Agreements.

12. Although First National had previously released its lien against certain cattle collateral of the Debtor, it later asserted a right to receive a certain percentage of any proceeds received by Debtor from the sale of cattle. Evidently, First National based its right to such amounts upon the extension of credit to the Debtor for the purchase of feed supplies. Both Debtor and Wysock were aware of First National's contention.

13. Pursuant to the terms of the First and Second Security Agreements, Debtor agreed "not to ... sell or otherwise dispose of (the cattle) ... without the prior written consent of the Secured Party."

14. Wysock testified, however, that FmHA did not require prior written consent before disposition of cattle collateral. "A simple phone call into the office to inform either the county supervisor, or the assistant county supervisor, or the clerical staff that the individual is making a move or has had a change of cattle numbers" was all that was required. Wysock noted that only supervisors within the FmHA office could approve disposition.

15. In May, 1980, Debtor sold approximately 270 head, and acquired cattle after receiving oral approval from Wysock. Wysock received the proceeds from the sale on May 16, 1980, and deposited them in the FmHA supervised account. Funds were then withdrawn to reimburse Debtor for the purchase of the additional cattle.

16. On May 22, 1980, Debtor informed Wysock that he was leaving Colorado to return to Concordia, and would be moving some of the cattle to Kansas. Debtor explained the existence of the Corporation farm and ranch operation and that the cattle would be taken there. Wysock did not object to Debtor's plans, and evidently did not forbid Debtor from moving the cattle out of the state.

17. FmHA filed a financing statement in the Official Records of the County Recorder, Cloud County, Kansas on August 14, 1980, in order to continue perfection of its security interest in the collateral.

18. Wysock left the employment of the County Supervisor's Springfield Office on September 1, 1980 and was replaced by Keith Kasselder in November, 1980.

19. Kasselder testified that his first contact with Debtor occurred on February 9, 1981, when Debtor turned over certain proceeds received from the sale of cattle in the 3T Lot at Ft. Morgan, Colorado. Kasselder testified that, contrary to FmHA requirements, he had received no advance notice that the sale would occur or that the cattle would be transferred from Campo to

Brush, Colorado. Kasselder admits that he accepted the proceeds and deposited them in the FmHA supervised account without reprimanding Debtor or apprising Debtor that his sale or transfer of the cattle was "unauthorized." Kasselder testified that he never apprised Debtor of his obligation to be "truthful" or to seek prior approval for such transfers or sales.

20. Debtor testified that his practice was to sell the cattle, pay any feed bills and expenses incurred with the sale and then send in the proceeds. According to Debtor, he was never told that he had to obtain prior permission. Debtor admits, however, that he obtained prior oral permission from Wysock before purchasing cattle in connection with his First Loan.

21. In deposition testimony and testimony given to a grand jury, the Debtor testified that it was his understanding that Kasselder came in to office as county supervisor to "shut everything down." Debtor understood that Kasselder had previously filed bankruptcy and did not want other farmers and landowners to borrow more money than Kasselder or to succeed. Specifically, Debtor complained in deposition testimony that Kasselder:

    a.   intended to close down forty-six (46) farmers, including Debtor;

    b.   denied all loan applications received and refused to disburse loan funds, even though already approved;

    c.   could not be reached at the county office;

    d.   refused to deduct enough funds from sale proceeds to allow Debtor to pay his feed bills.

22. Kasselder testified that when he first began dealing with the Debtor he found him to be "uncooperative". On March 12, 1981, Debtor failed to produce necessary records so a year-end analysis could be done. At a March 12, 1981, meeting, however, Debtor reported that "all cattle are in Kansas." Again, there is no indication in the record that Kasselder or any other FmHA employer reprimanded Debtor for removing the remaining portion of his cattle herd to Kansas.

23. On April 7, 1981, Debtor came to the FmHA office and reported that "all cattle are in Kansas." Debtor informed Kasselder that he was selling 50 cull cows and 150 heifers and would place the sale proceeds in an interest-bearing account until the differences with First National were settled. Kasselder agreed to this course of action. The account was opened in the names of "FmHA, First National and Jimmie Dorman," (hereinafter the "Three Party Account").

24. At the April 7, 1981, meeting Kasselder requested that debtor provide FmHA with certain records on sales and purchases so that Debtor's loans could be transferred to Kansas.

25. Debtor testified that he concluded Kasselder intended to "close him out." He decided to dispose of the cattle the best way he could and did not contact Kasselder further because he "wouldn't talk to that jackass under no circumstances."

26. Kasselder testified that from April, 1981 to November, 1981 he made the following attempts to reach Debtor:

    a.   numerous phone calls;

    b.   certified letter sent to Debtor's post office box, which was returned unclaimed;

    c.   trip to Concordia in August, 1981.

27. Kasselder testified that during his August, 1981 trip to Kansas he determined that the Debtor had engaged in one unauthorized sale. Kasselder filed a "Request for Legal Action" on September 1, 1981, with the FmHA state office, citing conversion against Debtor.

28. In a May 29, 1981, letter prepared by Kasselder, he admitted that by FmHA records it was hard to put anything together to determine what cattle had been purchased or sold.

29. On November 12, 1981, Debtor contacted Kasselder and provided "part of the information" Kasselder had been seeking. Specifically, Debtor's records accounted for the disposition of 416 head of cattle. Kasselder notified the various cattle buyers reflected in Debtor's records of FmHA's continuing lien against the property.

30. On January 6, 1982, Kasselder acknowledged in a letter to the FmHA State Office, that Debtor "appear[s] to have good records, and [has] agreed to cooperate with OIG [Office of Inspector General for the U.S. Department of Agriculture]" in order to identify the sales and purchases of FmHA liened cattle.

31. Kasselder left his position as county supervisor in the Springfield office in June, 1982. Kasselder stated that he left due to public pressure unfavorable to his family. Specifically, Kasselder was concerned with certain activities of a radical agricultural group within the Springfield, Colorado community, but was informed by FmHA attorneys and the county sheriff that no protection could be given his family until an incident occurred.

32. Despite Debtor's acknowledged willingness to cooperate in determining what FmHA liened cattle had been purchased and sold, FmHA went ahead with its own investigation. In July, 1982 William Stover, an employee of the Office of the Inspector General for the U.S. Department of Agriculture, was directed to investigate certain unauthorized dispositions or "suspected conversion" of collateral by the Debtor.

33. At the direction of an Assistant U.S. Attorney, Stover did not talk to Debtor in the course of his investigation. Stover identified approximately fifteen (15) transactions in which Debtor sold cattle liened to FmHA or made "unauthorized" transfers of liened cattle.

34. FmHA claims that from the 750–775 head initially pledged, approximately 100–130 offspring should have been produced creating a total of 850–900 head subject to FmHA's lien. FmHA claims that Debtor has accounted for only 474 head.

35. On October 14, 1982, Debtor filed a chapter 7 petition.

36. A grand jury hearing was conducted on April 27, 1983, in which Debtor's possible violation of 18 U.S.C. §§ 658, 1001 regarding unlawful disposition of FmHA collateral and the giving of false statements was considered. Debtor offered testimony regarding many of the transactions identified in Stover's investigation. The grand jury declined prosecution.

37. Debtor provided an explanation of each of the fifteen transactions identified by Stover in his testimony before this Court. Debtor and his bookkeeper, Janet Craig, also presented their own account of Debtor's purchases and sales of cattle liened to FmHA. Debtor claims that he has explained the disposition of 740 head, or all but 10 of the 750 head he claims were initially pledged. Debtor's calculations, however, do not differentiate between basic security and offspring.

38. This Court's analysis of the testimony of Kasselder, Stover, Debtor and Craig, and the sales records in evidence has resulted in a determination of the following chronology of sales and purchases:

A. On August 15, 1979 Debtor executed the First Security Agreement covering all cattle presently owned by Debtor, including the following cattle, as well as all after-acquired cattle and any and all offspring:

| Number | Type | Color | Weight |
|---|---|---|---|
| 36 cows | Beefmaster | Reddish tan | 1200 |
| 42 " | Hereford | Red W/F | 1000 |
| 19 " | Angus cross | Black W/F | 1000 |
| 8 " | Mixed | Roan mixed | 1000 |
| 11 Heifers | Beefmaster | Reddish tan | 750 |
| 47 Heifers | Holstein | B & W | 650 |
| 1 Bull | Simmental | Tan & white | 1800 |
| 2 bulls | Angus | Black | 1000 |
| 1 bull | Hereford | Red & white | 1200 |
| 4 bulls | Holsteins | B & W | 700 |
| 82 calves | Mixed | Mixed | 200–500 |
| 253 | TOTAL | | |

B. On August 16, 1979, First National released its lien against 111 cows, 11 replacement heifers and 5 bulls. (These cattle were already specifically included in the First Security Agreement and First National's release does not increase the number of cattle liened (253).)

C. August 23, 1979, Debtor purchased 142 holsteins, new total = 395 head.

D. September 20, 1979, Debtor purchased 30 heifers, new total = 425 head.

■ October 24, 1979, sale at Five States Auction, Clayton, New Mexico, 6 cows and 1 bull, new total = 418 head

FmHA contends —unauthorized sale, no proceeds to FmHA

Debtor contends —even though Debtor owned these cattle, they were not mortgaged to FmHA

E. October 27, 1979, Debtor purchased 52 mixed, new total = 470 head.

F. November 13, 1979, Debtor purchased 50 Black white-faced heifers from the Corporation through Laverne Jenkins at cost of $25,000. Wysock approved purchase, new total = 520 head.

G. December 11, 1979, Debtor purchased 87 head, new total = 607 head.

H. December 11, 1979, Debtor purchased 189 head, new total = 796 head.

I. On February 22, 1980, Debtor executed the Second Security Agreement covering all cattle presently owned by Debtor, including the following cattle, as well as all after-acquired cattle and any and all offspring:

| Number | Type | Color |
|--------|------|-------|
| 161 cows | Mixed | Mixed |
| 50 heifers | Holstein | B & W |
| 3 bulls | Angus | Black |
| 4 bulls | Holstein | B & W |
| 89 calves | Mixed | Mixed |
| 142 heifers | Holstein | B & W |
| 50 calves | Mixed | Mixed |
| 276 Heifers | Holstein | B & W |

775 TOTAL (hereinafter the "Basic Security")

According to this Court's calculations, as of February 22, 1980, at least 796 head were subject to the FmHA lien. FmHA, however, only claims a lien against the 775 head specifically identified in the Second Security Agreement. Debtor claims that the "50 calves" reflected in the Second Security Agreement are also included in the "89 calves," and that only 750 head were subject to FmHA's lien as of February 22, 1980.

This Court accepts FmHA's total of 775. Debtor signed the Second Security Agreement on February 22, 1980. He was familiar with loan documents, having taken out other secured loans of this type from other lenders. Debtor also had ample opportunity to examine the numbers reflected on the Second Security Agreement, and if such numbers were inaccurate Debtor should have corrected it at the time of execution.

■ April 16, 1980, sale at Hansen Livestock, 7 head calves with proceeds of $777.87.

FmHA contends —unauthorized sale no proceeds to FmHA

Debtor contends —cattle were owned by the Corporation and are not liened to FmHA

■ May 15, 1980, sale at Texhoma, 270 head with proceeds of $84,000. This Court finds that Debtor deposited proceeds in FmHA supervised account and was reimbursed for certain livestock he had purchased.

FmHA contends —60 of 270 head sold represent offspring of the Basic Security and should not be counted in determining disposition of the 775 which constitute Basic Security;

Debtor contends —all 270 head should be counted in determining disposition of Basic Security.

After examination of the sales records, this Court finds that 60 calves, which were sold as part of the 270 head are in fact offspring of 60 cows, which constituted part of Debtor's Basic Security. These 60 calves will not be counted in determining disposition of the original 775 head.

■ May 22, 1980, sale at McKinley–Winter, 124 or 126 steers.

FmHA contends —no proceeds to FmHA

Debtor contends —steers were owned by the Corporation, and are not liened to FmHA

■ July 17, 1980, sale Texhoma, 42 head of various brands,

FmHA contends —no proceeds to FmHA

Debtor contends —cattle were owned by Debtor's bookkeeper, Janet Craig, and are not liened to FmHA

■ October 25, 1980, sale Hansen Livestock, 10 head of Holstein bull calves, $1,476.60,

FmHA contends —no proceeds to FmHA

Debtor contends —bull calves were received from the Corporation by Janet Craig in lieu of wages, and are not liened to FmHA

■ February 5, 1981, sale Brush Creek, Colorado, 186 head; after deducting $32,676 for feed bills Debtor deposited net proceeds of $83,209.55 with FmHA.

■ March 30, 1981, sale Farmers & Ranchers, 29 head (27 calves, 2 steers). The final disposition of these sale proceeds is unknown, however, the consignor on the sale is identified on a sales document as "First National, FHA, and Dorman."

This Court finds that the 27 calves sold in this transaction are offspring of the Basic Security. A number of "calves" were initially pledged by Debtor in its Second Security Agreement executed almost one year prior to this transaction (hereinafter the "Basic Security Calves.") The Basic Security Calves however, having been fed and fattened over an eleven month period, could no longer be categorized as "calves." This Court finds that these 27 head are offspring and must not be counted in determining the disposition of the Basic Security.

■ April 13, 1981, sale Beatrice, 30 holstein heifers, $13,950.12. After deducting expenses, net proceeds were deposited in the Three Party Account.

■ April 18, 1981, sale Thies Packing Co., 45 cows, $21,199.00;

FmHA contends —no proceeds to FmHA

Debtor contends —cattle were owned by a friend, Maher, and were not liened to FmHA, but has no documents to prove Maher's ownership or receipt of proceeds

■ August 11, 1981, sale Brush, 1 holstein cow, $162.14; Debtor admits proceeds were not paid to FmHA.

■ August 18, 1981, sale Blansit, Mo., 120 head holsteins, $70,846.91. After deducting expenses, net proceeds were deposited in the Three Party Account.

■ October 10, 1981, sale Hansen Livestock, 3 calves, $177.92.

FmHA contends —no proceeds to FmHA

Debtor contends —cattle were owned by Janet Craig, and were not liened to FmHA

■ April 24, 1982, sale Hansen Livestock, 7 head. FmHA received proceeds.

■ Death loss:

Debtor's bookkeeper testified that:

12 head were lost to a blizzard

11 to pneumonia

60 to black leg disease

<u>14</u> to black leg disease at various times

97 TOTAL

According to this Court's calculations, if Debtor's testimony is accepted at face value, Debtor has failed to account for approximately 115 head of those 775 originally constituting FmHA's Basic Security. Debtor's sales records have accounted for 87 head of offspring.

## CONCLUSIONS OF LAW

### I. § 523(a)(6)

Section 523(a)(6) of the Bankruptcy Code provides:

(a) A discharge under section 727, 1141, or 1328(b) of this title does not discharge an individual debtor from any debt—

(6) for willful and malicious injury by the debtor to another entity or to the property of another entity.

Like other provisions calling for an exception to discharge in certain circumstances, § 523(a)(6) must be construed strictly against the creditor, and liberally in favor of the Debtor. *Gleason v. Thaw*, 236 U.S. 558, 35 S.Ct. 287, 59 L.Ed. 717 (1915). Such an interpretation is in accord with the Code's basic policy of providing the Debtor with a fresh start. H.R.Rep. No. 595, 95th Cong., 1st Sess. 125, *reprinted in* 1978 U.S.Code Cong. & Ad. News pp. 5787, 5963, 6086.

The debt will be deemed non-dischargeable under § 523(a)(6) if it meets two requirements: (1) the injury must be willful and (2) the act must be malicious. Courts

have consistently defined "willful" as intentional or deliberate. *See, e.g., In Re Compos,* 768 F.2d 1155, 1158 (10th Cir. 1985); *In Re Talcott,* 29 B.R. 874, 879 (Bankr.D.Kan.1983) (Franklin, J.). However, the question of what constitutes "malice" when the Debtor has intentionally sold secured property, has not been answered consistently.

▮ Courts have taken two general approaches in defining "malice." One line of cases requires that the plaintiff demonstrate the Debtor's conscious "intent to harm" the creditor. *In Re Nelson,* 10 B.R. 691, 4 CBC2d 548 (Bankr.N.D.Ill.1981); *In Re McLaughlin,* 14 B.R. 773 (Bankr.N.D. Ga.1981); *In Re Hodges,* 4 B.R. 513 (Bankr. W.D.Va.1980). The second line of cases requires no showing of ill-will, rather it requires that the "Debtor know that his act will harm another and proceed in the face of that knowledge." *In Re Ries,* 22 B.R. 343, 347 (Bankr.W.D.Wis.1982). *See also, Tinker v. Colwell,* 193 U.S. 473, 24 S.Ct. 505, 48 L.Ed. 754 (1904); *United Bank of Southgate v. Nelson,* 35 B.R. 765 (Bankr. N.D.Ill.W.D.1983); *In Re Clark,* 30 B.R. 685 (Bankr.W.D.Okla.1983); *In Re McCloud,* 7 B.R. 819 (Bankr.M.D.Tenn. 1980). Thus, under the second line of cases, constructive or implied malice is sufficient to establish malice under the exception. *Nelson,* 35 B.R. at 766, *citing Tinker.* This Court believes that the decisions in the second line of cases are based upon a sound rationale and accordingly follows them.

Such malice may be inferred from the conduct and nature of the Debtor's act. *Nelson,* 35 B.R. at 776. For example, in instances in which the Debtor (1) possesses experience in business, (2) conceals the fact that certain sales have been made, (3) admits that he has read the security agreement, which forbid the sale, or (4) admits that he understood what was meant by the term security agreement and collateral used as security, the Debtor's knowledge may be inferred. *In Re Eisner,* 35 B.R. 86 (N.D.Ohio E.D.1983); *In Re Ries,* 22 B.R. 343, 347 (Bankr.W.D.Wis.1982); *In Re Klix,* 23 B.R. 187 (Bankr.E.D.Mich.1982);

*In Re Ricketts,* 16 B.R. 833 (Bankr.N.D.Ga. 1982). "Secretiveness," "furtiveness or lack of explanation as to the use of the proceeds" may also provide adequate evidence of the Debtor's intent to deliberately harm the creditor. *In Re Beasley,* 62 B.R. 653 (Bankr.W.D.Mo.1986).

▮ Mere failure to pay over money received from the sale of secured property may not amount to a willful and malicious conversion, however, *Davis v. Aetna Acceptance Co.,* 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1934). *See also In Re Graham,* 7 B.R. 5 (Bankr.D.Nev.1980). Where there is an honest but mistaken belief, engendered by a course of dealing or acquiescence by the creditor, that powers have been enlarged in the debtor's favor or incapacities removed, the conversion is "innocent or technical" without willfulness or malice. *Aetna,* 293 U.S. at 328, 55 S.Ct. at 151. Thus, a debtor who in good faith converts the property of another under the mistaken belief that he has a right to do so "is to be relieved in bankruptcy and is not a malicious wrongdoer." *In Re Cline,* 52. B.R. 301 (Bankr.W.D.Ky.1985), *citing Nelson,* 35 B.R. at 766, 776; *See also, Aetna,* 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1934); *In Re Roberts,* 8 B.R. 291 (Bankr.W.D.Mo. 1981). Furthermore, it is immaterial whether the Debtor's belief was reasonable. A good faith belief, once demonstrated, and even if unreasonable, precludes a finding of malicious intent. *In Re Ries,* 22 B.R. at 347; *In Re Homer,* 45 B.R. 15, 23 (Bankr.W.D.Mo.,W.D.1984); *In Re Lewis,* 17 B.R. 46, 48 (Bankr.W.D.Ark.1981).

In its post-trial brief, FmHA urges this Court to allocate "little weight" to the testimony of Debtor and his bookkeeper, Janet Craig, due to their bias and self-interest, while affording greater weight to the testimony of FmHA witnesses due to their "impartial and dispassionate" status. This Court, for a number of reasons, is inclined to find that Debtor and Craig have testified in a sincere and truthful manner. By FmHA's own admission, Debtor, once reached by FmHA, appeared to have good records and agreed to cooperate in reconciling sales and purchases of FmHA liened

cattle. Toward this goal, Debtor used his best efforts to locate and provide any and all sales and purchase records within his possession. As additional documents were uncovered, Debtor made those documents available to FmHA. Debtor also willingly appeared at the grand jury hearing, again producing all purchase and sales records within his possession. That Debtor's sales records are incomplete is not in and of itself conclusive evidence that Debtor maliciously converted FmHA's collateral. (*See In Re Vance,* 43 B.R. 99, 102 (Bankr.W.D. Ky.1984), which stands for the proposition that lack of records does not by itself require denial of discharge.) Ultimately, the sales records in this case speak for themselves, and this Court has based its primary emphasis upon these records in determining a reconciliation of sales and purchases.

### A. Basic Security

■ This Court concludes that the sale of cattle identified in transactions [2], [4–6], and [13] of this Opinion do not constitute willful and malicious conversion. Debtor testified that although these cattle were sold in the Debtor's name, they were actually owned by the Corporation or Janet Craig, respectively. The Court is convinced that the Corporation actually exists, that it is engaged in dairy farming, and that it owned cattle in its own name pursuant to the dairy operation. Debtor testified that transaction [4] involved the sale of 124–126 steers belonging to the Corporation. As President of the Corporation, Debtor would have had knowledge of such a sale. Additionally, the disposition of Corporate cattle by the Debtor is consistent with his testimony that a number of Corporate cattle were grazed in Campo on a seasonal basis. Debtor's bookkeeper, Janet Craig, has also testified that cattle sold in transaction [4] belonged to the Corporation. With regard to transactions [5], [6], and [13] Janet Craig testified that all cattle belonged to her. FmHA contends that these cattle, even if owned by third parties, became subject to FmHA's security interest due to Debtor's total control over their purchase, care and sale. *See Kenetics*

*Technology Corp. v. Fourth National Bank of Tulsa,* 705 F.2d 396 (10th Cir. 1983).

Even if FmHA's argument is accepted by this Court, FmHA has still failed to prove Debtor's willful and malicious intent to convert these cattle. This Court believes that Debtor possessed a good faith belief that these cattle were owned, not by him, and not by FmHA, but by third parties. Debtor believed that the third parties gave him the right to sell these cattle on their behalf and he had no reason to believe that such sales would harm FmHA in any way. *Aetna,* 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1934); *See In Re Cline,* 52 B.R. 301 (Bankr.W.D.Ky.1985); *In Re Roberts,* 8 B.R. 291 (Bankr.W.D.Mo.1981).

■ FmHA has complained of "unauthorized sales" in connection with the other transactions identified in this Opinion. This Court finds, however, that FmHA acquiesced in Debtor's failure to obtain the necessary prior oral consent to such sales. On at least one occasion, Debtor presented FmHA with proceeds from cattle sales, which had not been previously approved. Both Wysock and Kasselder admitted, however, that they had never reprimanded Debtor for his failure to follow procedures. Instead, they accepted the proceeds from such sales, thus implicitly giving approval to Debtor's course of conduct. They also failed to explain Debtor's duty to obtain prior approval before moving his cattle. Debtor informed Wysock that he was leaving Colorado and taking some cattle with him to Kansas. Again, Wysock simply acquiesced. This Court finds that as a result of such acquiescence by Wysock and Kasselder, Debtor reasonably believed that prior approval of sales or transfers of cattle was not required, as long as FmHA received the proceeds from such sales. In light of these considerations, the Court concludes that the sale of cattle identified in transactions [3], [7] and [14] of this Opinion, in which FmHA directly received sales proceeds, do not constitute willful and malicious conversion.

■ Transactions [9] and [12] must be analyzed somewhat differently. The proceeds from those sales were not sent directly to FmHA, but were deposited in the Three Party Account created by Debtor. This Court finds, however, that Debtor's creation of the Three Party Account was not an attempt to "conceal the fact that certain sales have been made" and does not constitute "secretiveness" on the part of the Debtor. *See In Re Ries supra; In Re Klix, supra; In Re Beasley, supra.* Rather, Debtor created the Three Party Account and deposited sale proceeds in it because he was uncertain whether First National had a right to receive any portion of the proceeds. Kasselder was aware of the Three Party Account and agreed that sale proceeds would be deposited there until FmHA and First National settled their differences. Debtor's creation of the Three Party Account was thus an attempt to avoid double liability and not an attempt to conceal sales from FmHA. There is no indication whether Kasselder ever checked the balance in the Three Party Account while investigating Debtor, but he was aware of the account. This account was in FmHA's name and Kasselder could have easily determined whether any sums had been deposited therein. Accordingly, this Court concludes that the sale of cattle identified in transactions [9] and [12] of this Opinion do not constitute willful and malicious conversion.

■ This Court concludes that the sale of cattle identified in transactions [1], [10], [11], and [8] of this opinion constitute willful and malicious conversion. Debtor admits that 19 head of the 82 involved in these sale transactions were subject to FmHA's lien. He further admits that the proceeds realized from sales [1] and [11] were not deposited in the FmHA account or the Three Party Account. Debtor testified that he does not know the final disposition of proceeds realized from transaction [8]. Debtor testified that 45 head sold in transaction [10] actually belonged to a third party, Mr. Maher. However, the Debtor has failed to present any documentation of Maher's alleged ownership or that Maher ever received the proceeds from the sale of the cattle. Furthermore, Mr. Maher failed to appear to testify that he owned the cattle. Debtor has thus failed to prove that the cattle in transaction [10] belonged to Mr. Maher, and the Court concludes that they were Debtor's cattle, subject to the lien of the FmHA. Debtor has failed to demonstrate any evidence upon which this Court might base a conclusion that Debtor's conversion was based upon a good faith, even though mistaken, belief that he had a right to sell FmHA's cattle without paying over the proceeds. Debtor knew that his failure to turn over sale proceeds would harm FmHA, and yet he proceeded in the face of such knowledge. Checks and sale barn tickets establish that the Debtor sold 37 head involved in transactions [1], [10], [11] and [8]. This Court therefore concludes that the Debtor willfully and maliciously converted 82 head of cattle and must be denied a discharge in bankruptcy to the extent of their value.

### B. Offspring

■ FmHA has also complained that Debtor willfully and maliciously converted certain offspring of the cattle constituting the basic security. Specifically, FmHA estimates that the basic security should have produced 100–130 offspring. This Court finds that 87 offspring were sold in transactions [3] and [8]. If FmHA's calculations are accepted at face value, this leaves 13–43 offspring unaccounted for. FmHA's offspring reconciliation is based not only on the sales records in connection with transactions [3] and [8], but also on estimates or projections of the Basic Security's birth rate. At least one other bankruptcy court has refused to allow a creditor to use birth projections as a method of proving conversion. *See In Re Cline,* 52 B.R. 301, 304 (Bankr.W.D.Ky.1985). This Court, like the *Cline* court, finds that such projections constitute mere "conjecture," and are "an inadequate foundation upon which to rest the heavy consequences of nondischargeability." *Cline,* 52 B.R. at 305. This Court thus concludes that Debtor has not willfully and maliciously converted any offspring of the basic security, other than that previously identified in connection with transaction [8].

### C. Unaccounted Cattle

FmHA contends that Debtor has failed to account for the disposition of approximately 474 head of the 750–775 head initially liened to FmHA, leaving 276–301 unaccounted for. At trial, Debtor disputed FmHA's accounting of the disposition of the Basic Security, contending that only ten (10) head were unaccounted for. Debtor's accounting, however, included a number of cattle that were offspring and that must not be counted in determining the disposition of the Basic Security. Based upon the above-referenced transactions, Debtor has failed to account for the disposition of 70 head of those originally constituting FmHA's Basic Security. Debtor admits that he sold all cattle in his possession. His sale of the 70 head liened to FmHA was thus willful as required under § 523(a)(6). Debtor's sale was made with the knowledge that these cattle were liened to FmHA, and that the sale of these cattle without turning over the proceeds would harm FmHA. The Debtor, however, proceeded in the face of such knowledge. *See, In Re Ries, supra.* Malice can thus be inferred with the Debtor's conduct as required under § 523(a)(6). This Court concludes that Debtor's sale of 70 head constitutes willful and malicious conversion and that the Debtor must be denied a discharge in bankruptcy to the extent of their value.

### II. § 727(a)(5)

■ Section 727(a)(5) of the Bankruptcy Code provides:

(a) The court shall grant the debtor a discharge, unless—

(5) the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities;

A party objecting to a Debtor's discharge under § 727(a)(5) has the burden of proving facts establishing that a loss or shrinkage of assets actually occurred. *In Re La-Bonte,* 13 B.R. 887 (Bankr.D.Kan.1981). However, once the objecting party meets its initial burden of proof against the debtor, the burden of proof shifts to the debtor to explain the loss or deficiency of assets in a satisfactory manner. *In Re Chalik,* 748

F.2d 616, 619 (11th Cir.1984); 4 Collier on Bankruptcy ¶ 727.08 (15th ed.1984).

■ The Debtor testified that he sold all cattle within his possession, and that sale proceeds were turned over to the FmHA or applied to expenses. FmHA had a security interest in 775 head of cattle and their offspring. Debtor's records reflect the sale of 608 head of FmHA liened cattle, 87 offspring, and the death of 97 head. This leaves 70 head for which the Debtor has no documentation.

Lack of records does not by itself require denial of discharge. As the Court noted in *In Re Vance,* 43 B.R. 99, 102 (Bankr.W.D. Ky.1984), farmers are not "engaged in an occupation in which bookkeeping is the normal practice" (quoting *Matter of Worley,* 47 F.Supp. 212 (D.Neb.1942)).

As discussed above, this Court has found that 97 head died, 87 head were offspring and 526 head of the Basic Security were sold, and Debtor converted 152 head of the Basic Security. The Court concludes that Debtor's explanation that all the cattle in his possession were sold or died and the proceeds were applied to expenses and the FmHA loan is satisfactory. The Debtor is not denied a discharge under 11 U.S.C. § 727(a)(5).

### III. DETERMINING THE AMOUNT TO BE EXCEPTED FROM DISCHARGE

The final issue we must decide is how much of the debt to FmHA should be excepted from discharge. FmHA contends that there is no accurate or precise way to value the loss of the livestock security, and therefore the entire balance of the debt ($307,710.59) should be nondischargeable. Debtor, arguing that all but 10 head of cattle have been accounted for, has failed to address the issue of the method to be used in calculating the amount to be excepted from discharge.

■ Generally, the measure of damages for conversion of collateral is the value of the property converted, not the entire debt. *In Re Ries,* 22 B.R. 343 (Bankr.W.D. Wis.1982); *In Re Lewis,* 17 B.R. 46 (Bankr. W.D.Ark.1981); *In Re Howard,* 6 B.R. 256 (Bankr.M.D.Fla.1980). One court has held,

however, that where the debtor has placed collateral beyond the reach of the creditor, and there is no way to value the loss of collateral, the entire balance of the debt owing to creditor is nondischargeable. *In Re Ricketts,* 16 B.R. 833 (Bankr.N.D.Ga. 1982). This Court declines to follow *In Re Ricketts* in this instance. FmHA presently appears to be an undersecured creditor. Declaring the entire debt nondischargeable could very well work an unjust result by allowing FmHA to become more fully secured, thus improving its position as a result of Debtor's filing of bankruptcy. *See In Re Howard,* 6 B.R. 256 (Bankr.M.D.Fla. 1980).

In *In Re Ries,* 22 B.R. 343, 348 (W.D. Wis.1982) the court held that the creditor was entitled to receive:

> the amount it would have been able to realize, had it repossessed and sold the [collateral], declared nondischargeable. Although this may be the same as the amount it sold for, this is not necessarily the case. [Creditor] argues that because the debtors sold the [collateral], it is impossible to determine the actual value of the [collateral]. However, it should be possible for [creditor] to obtain evidence of the value of [collateral] of the same type and age and similar condition.

*Id.* at 348. The *Ries* court found that no such evidence had been presented and held that determination of the amount of the debt must await further hearing. *Id.* An additional hearing to determine the value of lost collateral in this case is not necessary.

This Court acknowledges that no evidence of the value of most of the cattle declared nondischargeable has been presented. However, evidence of the value of cattle constituting part of the Basic Security and the offspring, which are of the same type and age and in similar condition as the nondischargeable cattle, has been presented. Based upon this evidence, the Court makes the following findings as to the amount to be excepted from discharge:

(1) Transaction [1]   7 head   $ 3,812.30
(based upon actual sales documents)
(2) Transaction [11]   1 head   162.14
(based upon actual sales documents)
(3) Transaction [8]   29 head   9,599.00
(based upon an avg. price per head of $331.00, determined by dividing the sale prices reflected in

Ex. 15 and Exs. V, W by 638, the total number of head)
(4) Transaction [10]   45 head   $21,199.00
(based upon actual sales documents)
(5) Those cattle whose dispo-   70 head   23,170.00
sition Debtor has failed to reasonably explain (based upon an avg. price per head of $331.00, determined by dividing the sale prices reflected in Ex. 15 and Exs. V, W by 638, the total number of head)
              TOTAL   $57,942.44

This Court therefore holds that the amount of $57,942.44 shall be excepted from discharge under § 523(a)(6) in connection with the debt owed by debtor to FmHA.

■ This Court also holds that the imposition of sanctions against FmHA for abuse of discovery is appropriate. Generally, an award of attorney's fees as sanctions in favor of the prevailing party and against the United States is effective to the same extent that any other party would be liable for such fees and expenses under the common law or under the terms of any statute, which specially provides for such an award. 28 U.S.C. § 2412. The imposition of sanctions is authorized by Rule 7037 of the Bankruptcy Rules, which incorporates Rule 37, F.R.Civ.P. The tenth circuit has recently held that the federal rules of civil procedure shall be accorded "the force of a federal statute." *Quinones v. Pennsylvania General Ins. Co.,* 804 F.2d 1167 (10th Cir.1986) (quoting *Sibbach v. Wilson & Co.,* 312 U.S. 1, 61 S.Ct. 422, 85 L.Ed. 479 (1941)). Under Rule 37(d) where a party fails to answer interrogatories the court may make such orders as are just.

The record before this Court shows flagrant disregard by FmHA of its duty to respond to Debtor's Interrogatories, to make clear its intentions to dismiss one count of its complaint, and to obey this Court's numerous orders in connection with these discovery matters. On December 8, 1983, Debtor served FmHA with Interrogatories. At a pretrial hearing held on January 23, 1984, in response to Debtor's Motion for Order Compelling Plaintiff to Answer Interrogatories, this Court directed FmHA to file answers by the end of January, 1984. As of February 6, 1984, FmHA had not yet complied. Debtor filed a Motion for Judgment and Award of Attorney Fees on February 16, 1984. On March 26, 1984, at a second pretrial conference, this

Court again directed FmHA to file its answers by the end of March. As of May 7, 1984, FmHA had failed to comply with this Court's second directive, and such failure necessitated a continuance of the trial date, due to Debtor's inability to formulate a defense without answers to questions propounded in the Interrogatories.

FmHA's failure to act in accordance with this Court's Orders has caused Debtor to incur attorney's fees for: (1) the research, preparation and filing of certain motions; (2) preparation of correspondence to FmHA; and (3) appearances at hearings from January, 1984 through May, 1984. Debtor's counsel estimates that as of May, 1984, he had devoted thirteen (13) hours at an hourly rate of $75.00 to FmHA's failure to provide answers to Interrogatories. Accordingly, this Court orders that sanctions in the amount of $975.00 shall be imposed against FmHA.

The foregoing constitutes Findings of Fact and Conclusions of Law under Bankruptcy Rule 7052 and Rule 52(a) of the Federal Rules of Civil Procedure.